**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| NORTH AMERICAN DERIVATIVES EXCHANGE, INC., d/b/a OG.COM PREDICTION MARKETS,<br><br>*Plaintiff*,<br><br>v.<br><br>CATHERINE L. HANAWAY, in her official capacity as Attorney General for the State of Missouri; MICHAEL A. LEARA, in his official capacity as the Executive Director of the Missouri Gaming Commission; JAN M. ZIMMERMAN, in her official capacity as Chairman of the Missouri Gaming Commission; KEVIN M. SPAULDING, in his official capacity as the Commissioner of the Missouri Gaming Commission; KEVIN CANTWELL, in his official capacity as the Commissioner of the Missouri Gaming Commission; SAM GLADNEY, in his official capacity as the Commissioner of the Missouri Gaming Commission; ROGER STOTTLEMYRE, in his official capacity as the Commissioner of the Missouri Gaming Commission,<br><br>*Defendants*. | Civil Action No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff North American Derivatives Exchange, Inc., d/b/a OG.com Prediction Markets ("OG.com")[1], by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1. OG.com seeks declaratory and injunctive relief to restrain the Attorney General of Missouri ("State Attorney General") and the Members of the Missouri Gaming Commission (the "MGC") (collectively, "Defendants") from improperly and under color of Missouri state law assuming jurisdiction over, regulating and terminating OG.com's listing of lawful derivatives contracts on its federally regulated market.

2. OG.com is a designated contract market ("DCM") regulated by the U.S. Commodity Futures Trading Commission ("CFTC") that lists event contracts, including sports event contracts, for trading in interstate commerce. OG.com has operated as a federally regulated DCM since 2004.[2] All of its products are certified pursuant to the CEA and established CFTC rules and are offered in compliance with CFTC regulations, including standards for contract specifications, market integrity, and trader protections. As a CFTC-registered self-regulatory organization, OG.com also administers a comprehensive market regulation program, functioning

---

[1] North American Derivatives Exchange, Inc. launched OG.com in February of 2026 to provide a separate technology platform for users to access listed event contracts, distinct from the company's other offerings. *See* N. Am. Derivatives Exch., *OG.com or OG is a New Brand Association with the Exchange's Prediction Market Offering of Derivatives* (Feb. 4, 2026), https://www.nadex.com/notices/og-com-or-og-is-a-new-brand-associated-with-the-exchanges-prediction-market; Crypto.com, *Crypto.com Launches "OG"—a New Prediction Market Experience* (Feb. 3, 2026), https://crypto.com/us/company-news/cryptocom-launches-og-a-new-prediction-market-experience.

[2] The CFTC's orders approving North American Derivative Exchange, Inc.'s designation as a DCM are publicly available on the CFTC's Industry Filings page. *See Industry Filings, N. Am. Derivatives Exchange, Inc.*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations/34536.

in a regulatory capacity to oversee trading in its markets. This program is subject to CFTC oversight and has been reviewed and approved by the CFTC.

3. OG.com offers event contracts to Missouri residents in the state of Missouri under the authority granted to it by the CFTC. In a cease-and-desist letter ("C&D Letter") dated September 16, 2026, the State Attorney General has purported to assert jurisdiction over OG.com, demanding that it cease operations or comply with its interpretation of certain state laws. *See* Exhibit A, attached hereto. The C&D Letter threatens that, should OG.com not comply with its demands, "the State of Missouri will take legal action against Crypto.com." *Id.* at 3.

4. The crux of Defendants' assertion of authority is their conclusion that, "Crypto.com is an online sports wagering platform offering sports wagering to individuals located in the State of Missouri" subject to Missouri gaming laws.[3] Ex. A at 1. But Defendants ignore that through the Commodity Exchange Act ("CEA"), Congress expressly vested the CFTC with "exclusive jurisdiction" over DCMs and the products they make available for trading, including whether to prohibit certain event contracts—such as contracts related to gaming—as contrary to the public interest. 7 U.S.C. § 2(a)(1)(A); 7 U.S.C. § 7a-2(c)(5)(C).

5. According to the CEA and CFTC, "event contracts," such as those offered by OG.com, are derivatives or swaps whose returns are "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency."[4] At issue here are OG.com's event contracts, with return profiles dependent on the occurrence of specified events, for example, a

---

[3] The State Attorney General incorrectly addressed the C&D Letter to "Foris DAX, Inc. ('Crypto.com')" instead of North American Derivatives Exchange, Inc.

[4] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

certain sports team or participant winning or losing.[5] OG.com's event contracts were certified and became effective under the CEA's self-certification process. The CFTC has not prohibited OG.com's event contracts as being contrary to the public interest.

6. OG.com brings this action to obtain declaratory and injunctive relief to protect its right to offer event contracts pursuant to federal law and regulation. Indeed, any enforcement action by Missouri would be meritless, and any attempted enforcement efforts would be preempted by the CEA.

7. Congress has expressly preempted state regulation of trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of options and "transactions involving swaps." 7 U.S.C. § 2(a)(1)(A). A savings clause allows states to regulate conduct that does *not* fall within the CFTC's exclusive jurisdiction, confirming that the CFTC's exclusive jurisdiction is indeed exclusive. *See id.*

8. Missouri's regulation of trading on DCMs is also preempted because Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws including state licensing or registration conditions that Missouri might purport to apply to OG.com. Because OG.com's event contracts are lawfully traded on a CFTC-registered DCM, federal law overrides state licensing or registration conditions that might otherwise apply, including those cited by the State Attorney General in the C&D Letter. *See* Ex. A (alleging that OG.com's event contract activities violate Mo. Const. art. III, §§ 39(g)1, 39(g)10.a, 39(g)6, 39(g)15 and 11 C.S.R. §§ 45-20.360(1)(A), 45-20.360(6)).

---

[5] *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm. Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane. *Id.*

9. Insofar as it would prohibit OG.com from listing contracts that are authorized under federal law, Missouri law is also preempted because it conflicts with the CEA's framework. OG.com cannot comply with both its federal law obligations and any purported obligations under Missouri law. Missouri law also undermines the CEA's goals of, among other things, creating a uniform system of derivatives trading. This conflict between the CEA and state law is not just hypothetical. In the past several months, the CFTC has issued orders in New York and Michigan directing DCM KalshiEX LLC ("Kalshi") and its affiliates to continue performing their functions as federally regulated exchanges in direct response to state regulators' attempted enforcement of state law. *See infra* ¶¶ 67-68.

10. The threat of Defendants' attempted enforcement of Missouri law poses a direct and imminent threat to OG.com's business and its users and disrupts the comprehensive federal framework that places OG.com exclusively under the CFTC's supervision.

11. A declaratory judgment and injunction are necessary to prevent Defendants' unlawful intrusion into a market which they have no legal authority to regulate.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Missouri law is preempted by the CEA as applied to OG.com's event contracts. The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare the rights and legal relations of the parties.

13. This Court has personal jurisdiction over the Defendants. The Defendants are domiciled in Missouri and perform their official duties in Missouri.

14. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). The Defendants perform their duties and thus reside in this District. A substantial part of the events giving rise to the claims occurred in this District. Venue is likewise proper in this Division, and at this divisional office, pursuant to W.D. Mo. L.R. 3.2(b)(2), as OG.com's event contracts are offered to, and traded by, persons residing in the counties served by this divisional office, and the threatened enforcement described below reaches each such transaction.

15. The Eleventh Amendment does not bar this action. OG.com sues only state officials, in their official capacities, for prospective declaratory and injunctive relief to halt the threatened enforcement of state law that violates federal law. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908); *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645-46 (2002); *Mo. Prot. & Advoc. Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007) (Eleventh Amendment does not bar a suit to enjoin a state official who has some connection with the enforcement of an allegedly unconstitutional statute).

**PARTIES**

16. Plaintiff North American Derivatives Exchange, Inc., doing business as OG.com Prediction Markets, is a financial services company with its principal place of business in Chicago, Illinois. OG.com operates a DCM and Derivatives Clearing Organization regulated by the CFTC under the CEA, where users can trade financial products, including event contracts.

17. Defendant Catherine L. Hanaway is the Attorney General for the State of Missouri and is sued in her official capacity. The State Attorney General is the state's chief legal officer, tasked with "institut[ing], in the name and on the behalf of the state, all civil suits and other proceedings at law or in equity requisite or necessary to protect the rights and interests of the state." Mo. Rev. Stat. § 27.060.

18. Defendant Michael A. Leara is sued in his official capacity as Executive Director of the MGC.

19. Defendant Jan M. Zimmerman is sued in her official capacity as Chairman of the MGC.

20. Defendant Kevin M. Spaulding is sued in his official capacity as a Commissioner of the MGC.

21. Defendant Kevin Cantwell is sued in his official capacity as a Commissioner of the MGC.

22. Defendant Sam Gladney is sued in his official capacity as a Commissioner of the MGC.

23. Defendant Roger Stottlemyre is sued in his official capacity as a Commissioner of the MGC.

24. Together, Defendants Michael A. Leara, Jan M. Zimmerman, Kevin M. Spaulding, Kevin Cantwell, Sam Gladney, Roger Stottlemyre, and State Attorney General Catherine L. Hanaway would be responsible for enforcing Missouri state laws that are preempted by federal law as applied to OG.com.

## FACTUAL ALLEGATIONS

25. In the C&D Letter, Defendants indicated that they intend to "pursue enforcement actions" in an attempt to enforce Missouri state gambling laws against OG.com if OG.com does not comply with their demands. Ex. A at 1. Because the CFTC has exclusive jurisdiction over federally registered markets and intermediaries, Defendants' efforts to prohibit the trading of event contracts listed on federally regulated markets are preempted by federal law. OG.com is entitled to a judicial declaration that its activities are not subject to Defendants' oversight, regulation, or

jurisdiction, as well as an injunction barring Defendants from any future attempted enforcement efforts.

**A. OG.com Is a Federally Regulated DCM That Lists Event Contracts for Trading**

26. OG.com is a federally regulated DCM that provides a market for trading a variety of derivatives products, including event contracts, some of which are based on the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events.

27. The CFTC first approved OG.com as a DCM in 2004, confirming that its market complied with the CEA. Most recently in September 2025, the CFTC amended its registration, again confirming OG.com's compliance with the CEA. For two decades, the entity now known as OG.com has operated continuously as a CFTC-regulated market offering event contracts.

28. As an early entrant in the regulated event contract space, OG.com specializes in event contract trading and has steadily expanded its offerings over time. Its market provides a secure, federally approved exchange where individual, retail, and institutional participants can hedge risk tied to event-based outcomes.

29. On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. § 40.2(a), OG.com certified and announced its intention to list a new category of event contracts: "Industry Event - Live Presentations" contracts.[6] These contracts allow users to trade on the occurrence, non-occurrence, or extent of occurrence of events or contingencies relating to lawful live events

---

[6] North American Derivative Exchange, Inc.'s January 30, 2025 certification pertaining to sports event contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Contract (Industry Event–Live Presentations–NAICS 711)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (Jan. 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01302514705.pdf (hereinafter, "January 30, 2025 Certification Filing," attached as Exhibit B).

in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events. Ex. B at 4-5.

30. OG.com designed these event contracts "to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises." *Id.* at 8. These event contracts are also "designed . . . to meet the varied and diverse hedging and market needs of commercial firms and individuals impacted by or with an economic interest in the Industry Event outcome." *Id.* at 2. Examples include contracts tied to the winner of an award like "Best Picture," the location of a flagship event or ceremony, the winner of a live sporting event like the Super Bowl, or whether there will be a Major League Baseball lockout.

31. OG.com's currently listed "Industry Event - Live Presentations" contracts, including sports event contracts, were certified and became effective under the CEA's self-certification process described *infra* ¶¶ 52-56.

32. OG.com subsequently certified additional event contracts that reference the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events, including its certification of "Contingent Derivatives Deci Contract (Industry Event–Live Presentations–NAICS 711)," filed on July 30, 2025,[7] and "Derivatives Contract (Industry Event–Live Presentations–Statistics)," filed on August 29, 2025.[8] As with the sports

---

[7] North American Derivative Exchange, Inc.'s July 30, 2025 certification pertaining to sports event contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Contingent Derivatives Deci Contract (Industry Event–Live Presentations–NAICS 711)–Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (July 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/07/ptc07302527650.pdf.

[8] North American Derivative Exchange, Inc.'s August 29, 2025 certification pertaining to sports event contracts is publicly available on the CFTC's website. *Industry Filings, Certification of Derivatives Contract (Industry Event–Live Presentations –Statistics)–Submission Pursuant to*

event contracts certified under OG.com's January 30, 2025 Certification Filing, OG.com identified in these certifications the financial, commercial, and economic consequences associated with the underlying events.

**B. The CFTC Has Exclusive Jurisdiction to Regulate Derivatives Contracts on Federally Registered Markets**

33. Derivatives are financial instruments used to allocate risk between counterparties. The archetypal example is a grain futures contract, which allows buyers to lock in prices and manage volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date.

34. As financial markets have matured, the category of derivatives has expanded significantly beyond futures based on agricultural commodities, enabling participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk. In principle, nearly any form of risk—economic, environmental, or event-driven—can be hedged if a CFTC-regulated market exists and a contract is available.

35. For more than a century, the federal government has regulated national derivatives markets in order to promote uniformity and integrity in national trading.

36. Before the adoption of the CEA, futures contracts were often viewed with suspicion by state legislatures. Because derivatives markets necessarily involve the exchange of money tied to uncertain outcomes, some states equated them to gambling and sought to restrict or prohibit their use. This led to a disjointed and often conflicting state-by-state approach.

---

*Commission Regulation 40.2(a)*, CFTC (Aug. 29, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08292529772.pdf.

37. The CEA, enacted in 1936, was intended to replace the fragmented system of state oversight with a uniform federal framework for regulating futures markets. It extended federal authority beyond grain to a broader class of commodities and created the Commodities Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation. But the CEA did not initially establish an independent federal agency to comprehensively regulate the nation's derivatives markets. As markets grew more complex, lawmakers and industry participants became concerned that the lack of centralized enforcement would invite states to regulate futures trading on their own, leading to inconsistent standards across jurisdictions.

38. In response, Congress enacted sweeping amendments to the CEA in 1974 (the "1974 Act"), which established the CFTC as an independent federal agency charged with regulating the national derivatives markets. To eliminate the threat of conflicting state regulation, Congress expressly granted the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A).

39. Proponents of the 1974 Act warned that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). As one Senator put it, "different State laws would just lead to total chaos." *Commodity Futures Trading Commission Act: Hearings Before the Sen. Comm. on Agric. & Forestry*, 93rd Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark). The House Agriculture Committee stressed the need to bring "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974). To that end, the Senate deliberately removed a

provision of the CEA that would have preserved state regulatory authority "in order to assure that [f]ederal preemption is complete." 120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

40. Congress has continued to amend the CEA, with each amendment further underscoring its intent to vest the CFTC with exclusive authority over derivatives markets. Indeed, the 1992 Futures Trading Practices Act ("FTPA") authorized the CFTC, in order to promote innovation, to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c). Because the preemption provision in 7 U.S.C. § 2 applies only to derivatives traded on CFTC-registered markets, Congress included a separate provision explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement. 7 U.S.C. § 16(e)(2). That provision extended the scope of federal preemption to off-exchange transactions under the CFTC's oversight, reinforcing Congress's intent to create a comprehensive and uniform federal framework for derivatives regulation.

41. In 2010, Congress further expanded the CFTC's exclusive jurisdiction over derivatives markets by amending the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"). Congress added exchange-traded swaps to the types of derivatives within the CFTC's exclusive jurisdiction, *see id.* § 2(a)(1)(A), and expressly delegated authority to the CFTC and SEC to "further define" swaps as needed. 15 U.S.C. § 8302(d)(1). Congress also established a "Special Rule" expressly granting the CFTC discretionary authority to determine whether specific event contracts, including those that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or another similar activity, are "contrary to the public interest" and, if so, to prohibit them from

trading on DCMs. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule expressly contemplated CFTC regulation of sports-related event contracts by giving the CFTC authority to prohibit event contracts related to "gaming" if those contracts are contrary to the public interest. The Special Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but rather grants the agency the discretion to conduct a public interest review based on its own criteria.

42. This long history reinforces Congress' intent to create a national market for derivatives products despite individual states preferring to prohibit or regulate them.

**C. Event Contracts Are Swaps Under the CEA With Price Discovery Benefits, Predictive Value, and Allow Businesses to Hedge Risk**

43. DCMs list event contracts for trading in interstate commerce. Event contracts are exchange-traded financial instruments, known as derivatives or swaps, which the CEA broadly defines as relating to any "occurrence, extent of an occurrence, or contingency," 7 U.S.C. § 7a-2(c)(5)(C)(i), that is "beyond the control of the parties to the relevant contract" and "associated with a potential financial, economic, or commercial consequence." *See id.* § 1a(47) (defining "swap"); *id.* § 1a(19)(iv); *see also KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 226 (3d Cir. 2026) ("'[S]wap' includes event contracts.").[9]

44. Event contracts typically reference the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs by the expiration date, while

[9] Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

45. An event contract might be tied to specified movements of a financial index or a real-world event. For example, an event contract could be tied to changes in the yield on the 10-year U.S. Treasury note, the magnitude of the upcoming hurricane season, or to the events or contingencies associated with political, scientific or live sporting events. But, outside of its authority to prohibit specifically enumerated event contracts that it subsequently determines are contrary to the public interest, the CFTC does not purport to define what events are or are not properly the subject of event contracts. Rather, the regulatory approach that Congress has directed and that the CFTC has pursued is to allow the market to define the nature of the events on which parties wish to contract.

46. The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract. An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date.

47. Trading event contracts is not the same as sports wagering. There are several fundamental features that distinguish the two, including:

- <u>Counterparty</u>: DCMs are not a counterparty to or trader in their event contracts; rather, they facilitate a neutral market for trading among market participants. By contrast, with sports wagering, the house/bookmaker is the counterparty to the transaction.
- <u>Revenue model</u>: DCMs charge a per-contract transaction fee, and their revenue is not dependent on the outcome of the contract. By contrast, with sports wagering, the house profits only when customers lose.
- <u>Price discovery</u>: The prices of event contracts are set in real time by supply and demand among market participants, and market participants can hedge exposure to events on

which the contract is based. With sports wagering, odds are set solely by the house or sportsbook.

- Purchaser: Businesses, not just individuals, can purchase and trade event contracts. With sports wagering, only natural persons can place bets.

- Payout structure: Event contracts are based on a fixed notional value where settlement turns on whether the specified contingency occurs. With sports wagering, payout is determined by house-set odds at the time of the bet.

- Tradability: Positions in event contracts can be bought, sold, and re-traded before expiration, and prices fluctuate with market perceptions. With sports wagering, bets are generally not transferable or revisable once placed.

- Transparency: DCMs must publish daily settlement prices, volume, and open interest for its event contracts. There are no comparable public disclosure requirements for sportsbooks or casinos.

48. Because of the way event contracts are structured, they allow market participants, including those with a financial stake in the occurrence or non-occurrence of a particular event or contingency, to hedge against related risks. These contracts have become a valuable risk management tool because they are linked to real-world events with commercial consequences and offer public utility by reflecting the market's aggregated expectations about whether those events will occur. Event contracts where the underlying event relates to a sporting event may be used to hedge this type of risk across a variety of commercial scenarios, *see* Ex. B, including:

- Media and broadcasting companies that face financial exposure tied to viewership, which can fluctuate significantly depending on how competitive or compelling a game is;

- Retailers that sell team merchandise or apparel who see major swings in sales depending on whether a popular team advances or whether a player affiliated with their brand wins a championship;

- Travel and hospitality businesses that experience spikes in bookings if a local team advances or hosts a high-profile event, creating exposure to outcomes they cannot control;

- Restaurants and bars located around arenas such as Madison Square Garden, for example, can hedge against the risk of unexpected interruption to their business from

major events[10] or whether additional games in the NBA finals will be played in the arena;

- Consumer goods companies, especially in the food and beverage industry, that run promotions tied to game results. These campaigns, while effective for marketing, can carry substantial liabilities if the promotional conditions are met. Advertisers and retailers offering giveaways or rebates based on a team's success face similar exposure; and

- Fantasy sports platforms and sports data providers that rely on fan engagement and player performance, where a dull game or early elimination of a key player can significantly reduce user participation and revenue.

49. There are numerous examples where sports event contracts have been used to hedge risk. Game Point Capital, an insurance company that specializes in sports organizations, says that it has "arranged millions of dollars' worth of hedges through Kalshi."[11] Industry commentary has highlighted that sports event contracts will allow "small businesses that outright *depend on* a full 162-game MLB regular season schedule each year" to hedge their risks during a potential Major League Baseball ("MLB") lockout in 2027.[12] These businesses can currently use OG.com to trade an event contract regarding "Will Pro Baseball and the US Pro Baseball Players Association Reach

[10] *See, e.g.*, Devin Gannon, *NYPD Closes Area Around MSG for Knicks Game*, 6sqft N.Y.C. (June 10, 2026), https://www.6sqft.com/nypd-closes-area-around-msg-for-knicks-game; Charlie McKenna, *Boston PD to Shut Down Area Around TD Garden During Celtics NBA Finals Game*, Mass Live (June 17, 2024), https://www.masslive.com/news/2024/06/boston-pd-to-shut-down-area-around-td-garden-during-celtics-nba-finals-game.html.

[11] *See* Andrew Ross Sorkin et al., *Prediction Markets' Next Major Bet: Wall St. Traders*, N.Y. Times DealBook (June 17, 2026), https://www.nytimes.com/2026/06/17/business/dealbook/hedging-prediction-markets-kalshi.html.

[12] *See* David Huber, *Prediction Market Hedging Could Become Mainstream During 2027 MLB Negotiations*, Deadspin (Aug. 7, 2026), https://deadspin.com/prediction-markets/legal-news/prediction-market-hedging-could-become-mainstream-during-2027-mlb-negotiations; *see also* Joe Peta (@MagicRatSF), X (Aug. 4, 2026, 12:59 A.M.), https://x.com/MagicRatSF/status/2084866766732423467?s=46 (noting the extremity of the "binary economic impact for dozens of cities, hundreds of business and thousands of people" the outcome of Kalshi's market for how many MLB games will be played next season has, such that "[w]e should be cheering @Kalshi for its existence").

a New [Collective Bargaining Agreement] Before December 2, 2026?," i.e., whether a lockout will occur, and on an event contract regarding whether the "Pro Baseball Regular Season Start Date 2027 [will be] Before April 1, 2027." Without the ability to hedge these risks using event contracts, "[l]ocal bars, food vendors, parking lots, souvenir shops, and even ticket scalpers could see their revenues catastrophically slide if the MLB regular season is canceled or shortened due to stalled negotiations."[13]

50. These are just a few examples, but they underscore a broader point: Many businesses across diverse industries have meaningful financial exposure to the occurrence, non-occurrence, or extent of occurrence of events or contingencies connected to sporting events and may seek to manage that risk through event contracts.

**D. The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory Framework for Trading in Event Contracts and Other Derivatives**

51. The federal regulatory framework governing DCMs and the trading of derivatives contracts on DCMs is longstanding, comprehensive, and well-established.

52. To offer derivatives for public trading, an entity must obtain designation from the CFTC as a contract market. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

53. To receive this designation, an applicant must submit detailed materials demonstrating compliance with the CEA's "Core Principles." *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d). This requires it to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process

[13] *Id.*

through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

54. If approved by the CFTC and granted designation as a contract market, a DCM becomes subject to an extensive federal regulatory framework administered by the CFTC. DCMs are required to meet a wide range of ongoing regulatory obligations to remain in good standing, including: prescriptive capital and liquidity requirements, participant eligibility requirements, reporting obligations, recordkeeping requirements, and numerous operational and governance standards directed toward compliance with the CEA and its Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31; 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

55. Moreover, because of the breadth and depth of the regulatory framework applicable to a DCM, a market that has earned the CFTC's designation is granted the status of a self-regulatory organization under federal law. As such, DCMs are entrusted with front-line responsibilities for establishing rules and enforcing their compliance, detecting and preventing market abuses, and ensuring the integrity of their listed products and intermediaries. *See* 17 C.F.R. § 1.3, pt. 38. Specifically, DCMs must adhere to product-related regulatory standards and certify that each new contract complies with applicable law by filing a written certification with the CFTC prior to the time of listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).

56. Written certifications are subject to CFTC regulation, and the CFTC may initiate a formal review of any submitted contract under its authority. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11(c). After a stipulated period of time, if the CFTC does not take action, the contract

is deemed "effective" and may be listed on the DCM for trading. *See* 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 40.2 (outlining the process for listing products for trading by certification).

57. In addition to regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

58. The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings. *See* CFTC Division of Enforcement, Enforcement Manual (2020) at § 3.3. If the Division concludes that a violation of the CEA has occurred, it may recommend the Commission pursue a broad range of remedies, including civil monetary penalties, restitution, and disgorgement, as well as the suspension, denial, revocation, or restriction of registration and trading privileges. *Id.* The Commission may also pursue injunctive relief, including cease-and-desist orders, and can refer criminal violations to the Department of Justice for prosecution. *Id.*

### E. The CFTC Has Repeatedly Confirmed Its Exclusive Authority Over Event Contracts Traded on DCMs

59. The CFTC has confirmed numerous times that it has exclusive authority over event contracts traded on DCMs. The CFTC has brought actions against the states and state regulators in eight states, alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See United States & CFTC v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026); *United States & CFTC v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Apr. 2, 2026); *United States & CFTC v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026); *United States & CFTC v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026); *United States & CFTC v. Minnesota*, No. 0:26-cv-02661 (D. Minn. May 19, 2026); *United States & CFTC v. New Mex.*, No. 1:26-cv-01912

(D.N.M. June 12, 2026); *United States & CFTC v. Kentucky*, No. 3:26-cv-00049 (E.D. Ky. June 23, 2026). The CFTC also moved to intervene in a lawsuit brought by Kalshi against state regulators in Rhode Island. *KalshiEX LLC v. Furcolo*, No. 1:26-cv-00327 (D.R.I. May 28, 2026) ECF No. 19. The CFTC has also submitted briefs as an amicus curiae supporting OG.com's action brought against state regulators in Nevada and supporting other prediction markets' actions brought against state regulators in Ohio, Tennessee, and Michigan. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada.*, No. 25-7187 (9th Cir. Feb. 17, 2026) ECF No. 38; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *Kalshiex, LLC. v. Schuler*, No. 26-3196 (6th Cir. May 12, 2026) ECF No. 31; Brief for CFTC as Amicus Curiae Supporting Plaintiff, *KalshiEX, LLC. v. Orgel*, No. 26-5235 (6th Cir. June 24, 2026) ECF No. 63; Amicus Brief of CFTC in Support of Plaintiff-Appellant, *QCX LLC d/b/a Polymarket US v. Nessel*, No. 26-1552 (6th Cir. Aug. 24, 2026) ECF No. 20.

60. In addition, the CFTC has issued several Notices of Proposed Rulemaking Relating to Prediction Markets. The CFTC issued Release No. 9194-26 (Mar. 12, 2026) along with a Prediction Markets Advisory (CFTC Letter No. 26-08) explaining that event contracts are "swaps" under the CEA.

61. The CFTC also issued Release No. 9249-26 (June 12, 2026) seeking public comment on a proposed amendment to Regulation 40.11 (17 C.F.R. § 40.11) to clarify the public interest determination framework pursuant to the Special Rule. 91 Fed. Reg. 35,806. First, the Release makes clear that sports event contracts involve "gaming" under the Special Rule, *see* Proposed Rule 40.11(b)(1). Second, it clarifies that the CFTC has never interpreted the Special Rule as a "*per se* prohibition" of event contracts involving activities enumerated in the Special Rule, such as gaming. *Id.* at 35,815. Third, it establishes a framework to determine "when event

contracts involving sports events are not contrary to the public interest." *Id.* at 35,869-35,870. Fourth, the CFTC preliminary concludes that sports event contracts are not contrary to the public interest. *Id.* at 35,836, 35,853. Finally, it discusses how sports event contracts "can serve as price discovery tools by indicating what the market or the general public thinks about the underlying events or issues (i.e., market sentiment)." *Id.* at 35,865.

62. On October 9, 2026, exercising its authority to "further define" the term "swap," 15 U.S.C. § 8302(d)(1), the CFTC proposed a rule providing that the term "swap" includes "[e]vent contracts, including those based on sports-, politics-, cultural, and weather-related events." *Further Definition of "Swap"—Inclusions*, RIN 3038-AF82, at 4, 40 (CFTC Oct. 9, 2026) (notice of proposed rulemaking). As the CFTC explained, "[f]or decades, the CFTC's position has been that event contracts are derivatives subject to its jurisdiction" and "the best reading of the statute" is that event contracts based on sporting events "qualify as swaps." *Id.* at 12-13.

63. The same day, the CFTC issued an interim final rule, effective immediately upon publication, that excludes from the definition of swap "[c]asino-style gambling products," i.e., wagers accepted by a state- or tribal-licensed gaming operator "acting within the scope of that license" that are "not traded on a board of trade, an organized exchange, a swap execution facility, or any other market in which trades are executed multilaterally." *Further Definition of "Swap" to Exclude Casino-Style Gambling Products*, RIN 3038-AF81, at 40 (CFTC Oct. 9, 2026) (interim final rule) (hereinafter "Exclusion IFR").

64. The CFTC explained that gambling products "are typically conducted as bilateral transactions between a casino or bookkeeper (a 'house') and its customer rather than on an organized market," at prices "unilaterally dictated by the casino or sportsbook." *Id.* at 14-15.

Gambling products use prices that "are not set by market forces and are not subject to negotiation; rather, customers must accept the price set by the house." *Id.* at 14. And they "are not inherently tradeable" distinguishing them from "derivative[s] within the Commission's jurisdiction." *Id.*

65. On the other hand, event contracts "are traded on CFTC-registered national exchanges at market-set prices through the interaction of bids or offers placed on a central orderbook, not at prices unilaterally dictated by a 'house,'" on exchanges that "are neutral" and "do not profit when the event contract settles one way versus another," and "are centrally cleared by CFTC-registered clearinghouses to eliminate counterparty credit risk, just like other derivatives transactions." *Id.* at 17-18. The rule includes contracts "entered into on a trading facility, including a DCM" in the definition of swap, because these contracts' "price and other economic terms would be determined through the competitive interaction of multiple buyers and sellers on a multilateral basis." *Id.* at 23-24.

66. Thus, the rule corrects the "erroneous premise that if event contracts are swaps, then casino-style gambling products must also be swaps," *id.* at 9, and confirms that "while gambling is traditionally state-regulated, event contracts are traditionally federally regulated," *id.* at 2. The Exclusion IFR was expressly issued to combat "state-level actions"—such as the action threatened by Missouri here—that "imperil a nascent industry that Congress has entrusted to the 'exclusive jurisdiction' of a federal agency, the CFTC." *Id.* at 29.

67. The CFTC also reaffirmed its position that a patchwork of differing state regulations would make it impossible for DCMs like OG.com to comply with CEA Core Principles. For example, on August 11, 2026, the CFTC issued an emergency order directing Kalshi and its affiliates to continue to perform their functions as exchanges in response to New

York's ongoing enforcement action against Kalshi.[14] The CFTC emphasized that compliance with New York's proposed temporary restraining order, if granted, would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)).

68. Additionally, on July 12, 2026, in response to a state court decision ordering Kalshi to "void[], cancel[], and refund[]" trades entered into by Kalshi traders located in Michigan, Kalshi notified the CFTC that it would "force-liquidate the open positions of specific users identified and directed by the Court."[15] In response, on July 14, 2026, the CFTC issued an Order directing Kalshi to "fulfill the open trades in question as it would in the ordinary course of business." CFTC Michigan Order at 9. The CFTC found that the "unprecedented order requiring Kalshi to unwind open, previously executed trades" constitutes a "'major market disturbance which prevents the market from accurately reflecting the forces of supply and demand' with respect to event contracts." *Id.* at 6-7. Most significantly, the CFTC wrote that "forced liquidation of trades will cause distortions" which "would, among other things, violate CEA Core Principle 4, which

---

[14] Order Directing Kalshi to Continue Exercising DCM Functions at 9, *In the Matter of KalshiEX LLC's Notice Regarding Market Emergency Declaration*, CFTC (Aug. 11, 2026), https://www.cftc.gov/media/14471/OGC_MarketEmergencyDeclarationOrder081126/download (hereinafter, "New York CFTC Order").

[15] CFTC Order Staying Emergency Rule Filed by KalshiEX LLC and Directing Kalshi to Fulfill Open Trades Involving Michigan Residents, *In re Matter of KalshiEX LLC's Notice Regarding Mkt. Emergency Declaration & Emergency Rule Filing Pursuant to Comm'n Reg. 40.6(a)*, CFTC (July 14, 2026), https://www.cftc.gov/filings/documents/2026/orgcftcorderstayingkalem61407.pdf (hereinafter, "CFTC Michigan Order").

requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id*. at 8. This directive applies with equal force here and nationwide.

### F. Missouri Has an Extensive Regime for Regulating Sports Betting and Wagering

69. The state of Missouri extensively "regulates sports betting." Ex. A at 1. The Missouri constitution forbids the state General Assembly "[t]o authorize lotteries or gift enterprises for any purpose" except as the Constitution itself provides, Mo. Const. art. III, § 39(9), and the Criminal Code makes unauthorized gambling a crime, Mo. Rev. Stat. §§ 572.010-.040. Since 2024, sports wagering may be conducted only by licensees of the Gaming Commission. Mo. Const. art. III, § 39(g).

70. The MGC licenses and regulates gaming in Missouri. Mo. Rev. Stat. § 313.004. It issues the retail and mobile licenses through which sports wagering may be offered, Mo. Const. art. III, § 39(g)(4)-(5), and "shall have the power to adopt and enforce commercially reasonable rules, including emergency rules, to implement" the sports wagering provisions, *id.* § 39(g)(9). The MGC has used this authority to adopt such rules, *see* Mo. Code Regs. Ann. tit. 11, ch. 45-20, and "may impose fines upon any person holding, or required to hold, a license or approval under" the sports wagering provisions "or the rules subsequently adopted," of up to $50,000 per violation, Mo. Const. art. III, § 39(g)(9)(k).

71. In November 2024, Missouri voters amended the state constitution to authorize sports wagering. Mo. Const. art. III, § 39(g). The amendment defines "[s]ports wagering" as "wagering on professional or collegiate athletic, sporting, and other competitive events and awards involving human participants including, but not limited to, esports, or any other events as approved by the Commission," including "bets or wagers made on . . . portions of athletic and sporting events or on the individual statistics of professional or collegiate athletes." *Id.* § 39(g)(16)(k).

72. Pursuant to the amendment, "any entity licensed by the Commission . . . may offer sports wagering" "through an online sports wagering platform to individuals physically located in this state," on gambling boats, or within a professional sports team's sports district. *Id.* § 39(g)(2). The MGC is permitted to issue retail and mobile licenses only to licensed gambling boats, professional sports teams, and sports wagering operators acting on their behalf, with "not more than two mobile licenses . . . directly to qualified applicants that are sports wagering operators." *Id.* § 39(g)(4). Each licensee pays a wagering tax of 10% of its adjusted gross revenue. *Id.* § 39(g)(10).

73. The two sports wagering direct mobile licenses have already been awarded, and no others are available under the law.[16] All other mobile licenses are tied to gambling boats or professional sports teams. Mo. Const. art. III, § 39(g)(4).

74. Other gaming requirements include that every wager "must be initiated, made, or otherwise placed by a bettor while physically present within this state," which licensees must enforce with geofencing technology. *Id.* § 39(g)(12).

75. Missouri also criminalizes unlawful gambling. The Missouri Criminal Code states that a person "engages in gambling when he or she stakes or risks something of value upon the outcome of a contest of chance or a future contingent event not under his or her control or influence, upon an agreement or understanding that he or she will receive something of value in the event of a certain outcome," and gambling is "unlawful" when it is "[n]ot specifically authorized by law." Mo. Rev. Stat. § 572.010(4), (13). "Bookmaking" is "advancing gambling activity by unlawfully accepting bets from members of the public as a business . . . upon the

[16] Mo. Gaming Comm'n, *Missouri Gaming Commission Selects Two Sports Wagering Direct Mobile Licenses* (Aug. 15, 2025), https://www.mgc.dps.mo.gov/CommissionNews/CommNews/2025_MGCSWDirectMobileLicensesPress.pdf.

outcomes of future contingent events." *Id.* § 572.010(2). A person who "knowingly advances or profits from unlawful gambling" commits a class A misdemeanor, *id.* § 572.040, and a person who does so by "[e]ngaging in bookmaking to the extent that he or she receives or accepts in any one day more than one bet and a total of more than one hundred dollars in bets" commits a class E felony, *id.* § 572.030(1). Gambling itself is a class C misdemeanor, and a class A misdemeanor if committed by a "professional player." *Id.* § 572.020. The Criminal Code excludes from "gambling" "bona fide business transactions valid under the law of contracts, including but not limited to contracts for the purchase or sale at a future date of securities or commodities," contracts of indemnity and insurance, certain amusement devices, and licensed riverboat gaming. *Id.* § 572.010(4).

**G. The State Attorney General Ordered OG.com to Cease-and-Desist Its Operations Unless It Complies with Missouri State Law**

76. On September 16, 2026, the State Attorney General issued the C&D Letter to OG.com, contending that "Crypto.com is an online sports wagering platform offering sports wagering to individuals located in the State of Missouri, despite not submitting to regulation by the Missouri Gaming Commission as required by Missouri law." Ex. A at 1. The C&D Letter ordered OG.com to either "cease and desist from such activity," or to comply with Missouri licensing, taxes, and regulations governing sports betting. *Id.*

77. Specifically, the C&D Letter stated that the Missouri Constitution provided for regulation of the "sports wagering industry," as it would "provide substantial tax revenue." *Id.* (quoting Mo. Const. art. III, § 39(g)1). Under Missouri law, the C&D Letter indicated that OG.com was "required to obtain a license from the Missouri Gaming Commission," and since OG.com was operating in the state without such a license, it was in "violation of Missouri law." *Id.*

78. The C&D Letter also complains that OG.com has "fail[ed] to pay state taxes and fees," which includes a "wagering tax of 10% on 'the adjusted gross revenue' from all in-state sports wagering." *Id.* (quoting Mo. Const. art. III, § 39(g)10.a). The purportedly required fees also include an "initial license fee" and a "renewal fee every five years," which can be "as much as $500,000." *Id.* at 2 (quoting Mo. Const. art. III, § 39(g)6).

79. The C&D Letter then claims that state laws, such as the ones that the State Attorney General purports to enforce against OG.com, are not preempted by federal law, including the CEA, and that OG.com is not subject to the CFTC's exclusive jurisdiction. *Id.*

80. OG.com was given 30 days to comply with the C&D Letter's demands. *Id.* at 3.

81. By press release dated September 17, 2026, the State Attorney General also indicated that her office had issued cease-and-desist letters to five other "prediction market operators offering sports 'event contracts' to Missourians." *See* Mo. Atty. Gen., Press Release, *Missouri Attorney General Hanaway Orders Unlicensed Prediction Markets To Cease And Desist Unlawful Sports Wagering* (Sep. 17, 2026), https://ago.mo.gov/missouri-attorney-general-hanaway-orders-unlicensed-prediction-markets-to-cease-and-desist-unlawful-sports-wagering. These letters were issued to QCX Limited Liability Company ("Polymarket"), Kalshi, Ludlow Exchange, LLC ("Novig"), Underdog Sports Wagering, LLC ("Underdog"), and Robinhood Derivatives, LLC ("Robinhood").

82. In a September 17th interview, the State Attorney General claimed that "[e]ven though [event contract] fee structure might be a little bit different, it still fits four square the definition of gambling in Missouri." Blake Schowalter, *Missouri Attorney General Sends Cease-and-Desist to Prediction Market Companies*, KFVS12 (Sep. 17, 2026), https://www.kfvs12.com/2026/09/17/missouri-attorney-general-sends-cease-and-desist-

prediction-market-companies. The State Attorney General opined that her office's goal is to bring the platforms under Missouri's gaming laws and wagering tax, and that, if they do not agree, her office will pursue litigation. *Id.*

83. In light of the threatened attempted enforcement by the State Attorney General against OG.com and public statements committing to continue attempting to enforce state law against prediction markets, there is a concrete and imminent threat that Defendants will file an enforcement action against OG.com.

### H. Defendants' Attempted Enforcement Against OG.com Will Imminently and Irreparably Harm OG.com and Interfere with Its Ability to Conduct Federally Regulated Activities

84. OG.com's rulebook sets forth over 50 different event contracts, all of which are subject to federal regulation pursuant to the process described above.

85. OG.com permits event contracts to be purchased and sold by residents of Missouri and other states and territories.

86. As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject OG.com and its customers to irreparable harm. Being subject to an unlawful state enforcement action would cause OG.com irreparable injury, both in economic terms and in terms of being restrained from lawful activity without any monetary recourse.

87. Ceasing to permit Missouri residents to purchase or sell event contracts on OG.com's DCM in order to avoid civil penalties or sanctions pursued by Defendants would deprive OG.com of the revenue that it would otherwise derive from trading of event contracts by Missouri residents. The C&D Letter also threatened OG.com that it was subject to the purported "wagering tax of 10%" and licensing fees of up to $500,000. Ex. A at 1-2. These ongoing

economic losses would be unrecoverable because sovereign immunity bars recovery for monetary damages. *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999). Damages that are unrecoverable due to sovereign immunity constitute irreparable harm. *See Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887, 899-900 (8th Cir. 2000) (the "importance of preliminary injunctive relief is heightened" where "[r]elief in the form of money damages could well be barred by [the State's] sovereign immunity"); *Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994) (economic harm irreparable where the plaintiff "would be unable to recover any damages" because the state agency has "sovereign immunity in federal court in suits requesting money damages"); *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) (although "the loss of money is not typically considered irreparable harm, that changes if the funds 'cannot be recouped'" (citation omitted)); *see also Bank One, Utah v. Guttau*, 190 F.3d 844, 851 (8th Cir. 1999) ("continued enforcement" of a state statute preempted by federal law "would result in irreparable economic loss" to the regulated party).

88. Moreover, the potential loss to OG.com's reputation and goodwill are also an irreparable injury. *See United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury."); *Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789-90 (8th Cir. 2010) (loss of goodwill from operating under an unlawful ordinance irreparable where lost customers "would be unlikely to return once the Ordinance's restrictions are lifted").

89. If OG.com were to cease permitting Missouri residents to purchase or sell event contracts on its DCM to avoid an enforcement action, it would also suffer competitive injury by losing the ability to compete as a market for event contracts against other federally registered DCMs operating in the state.

90. OG.com could not avoid irreparable harm by seeking a license in Missouri or by ceasing to offer event contracts trading in Missouri. Obtaining a gambling license in Missouri may require significant hurdles that could require OG.com to evade its CFTC-mandated DCM obligations, and under current Missouri law, *no licenses are even available*. The Missouri constitution allows the MGC to issue mobile licenses only to licensed gambling boats, professional sports teams, and sports wagering operators acting on their behalf, plus two direct licenses to sports wagering operators. Mo. Const. art. III, § 39(g)(4). The MGC has already awarded both direct licenses and acknowledged that it is unable to grant more. *See supra* ¶ 73. Even if a license were available, under Missouri law, OG.com would only be able to accept "wagers" from persons "physically present" in Missouri, Mo. Const. art. III, § 39(g)(12), depriving its market of the nationwide liquidity on which it depends and violating the CEA's mandate that a DCM provide "impartial access" to its participants. *See* 17 C.F.R. § 38.151(b).

91. In addition, it would be entirely impracticable for OG.com to subject itself to the often conflicting regulations of each of the states in which it offers federally regulated event contracts for trading. Accepting such jurisdiction would subject OG.com to the very patchwork of state regulation (including prohibitions, regulations, reporting obligations, registration costs, and other rules) that Congress expressly preempted under the CEA. Different states have taken different approaches to regulation of online gambling. Many states permit online gambling, subject to state-level regulation. Others, such as Utah, prohibit it entirely. It would be impossible for OG.com to both offer "impartial access" to its DCM as required by 17 C.F.R. § 38.151(b) and simultaneously comply with state gaming laws in 50 states.

92. The threat of attempted enforcement alone presents OG.com with the Hobson's choice between subjecting itself to potential penalties brought by the State Attorney General, with

all the expenditures and reputational damage that entails, or incurring the substantial monetary expenditures to ensure compliance with the authority the State Attorney General has asserted. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding injunctive relief available where imminent enforcement actions created such a Hobson's choice leaving party with no adequate remedy at law). This latter choice also violates the CFTC's Core Principles by disrupting contracts or geographically limiting who can enter contracts on OG.com's national exchange. *See supra* ¶¶ 53-55, 67-68.

93. This Hobson's choice is not hypothetical—the exact issue has reached a tipping point in New York and Michigan. The CFTC stated that New York's proposed temporary restraining order against Kalshi would "contravene[] CEA Core Principles 4 and 9, which require a DCM to 'prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process' and 'provide a competitive, open, and efficient market and mechanism for executing transactions that protects the price discovery process of trading in the centralized market.'" New York CFTC Order at 8-9 (citing 7 U.S.C. § 7(d)(4), (d)(9)). The CFTC's Michigan Order directed Kalshi to "fulfill open trades in the ordinary course of business" despite a state court order to "force-liquidate the open positions" of Michigan residents. CFTC Michigan Order at 3, 9. The CFTC found that compliance with the state court order would cause price and market distortions in violation of CEA Core Principle 4, "which requires DCMs to prevent manipulation, price distortion, and disruption of the cash-settlement process." *Id.* at 8. Here, OG.com's compliance with Missouri's gambling laws would cause OG.com to violate the CFTC's Core Principles and risk its certification as a DCM.

94. If OG.com were to submit to the regulatory oversight of the MGC to avoid an enforcement action, OG.com would be subjected to a regulatory regime inherently in conflict with CFTC regulations, including its Core Principles, and the very concept of a registered DCM.

95. Inaction in the face of Defendants' likely assertion of authority to regulate DCMs would threaten the future of OG.com's business in Missouri. An actual and substantial controversy exists between OG.com and Defendants as to their respective legal rights and duties. The imminent threat of an enforcement action against OG.com will result in irreparable injury to OG.com, including, but not limited to, criminal liability, civil liability, economic hardship, and impairment of existing contractual relationships.

96. OG.com has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Moreover, because money damages are generally not available in suits against state government agencies, OG.com likely would be left without a remedy in the absence of prospective relief.

97. OG.com therefore brings this action to seek declaratory and injunctive relief restraining Defendants from enforcing Missouri law that interferes with the operation and function of OG.com's market described herein.

## COUNT I

## (Express Preemption – Against All Defendants)

98. Plaintiff incorporates all prior paragraphs by reference.

99. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

100. An actual controversy exists between OG.com, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of OG.com's event contracts.

101. For the reasons described above, without regard to whether Defendants have correctly interpreted Missouri law, OG.com is authorized to list and offer event contracts to Missouri residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular sports event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC. 7 U.S.C. § 2(a)(1)(A).

102. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Missouri law, Missouri law is preempted pursuant to the Supremacy Clause, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

103. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

104. The CEA's express preemption of state laws purporting to regulate trading on federally regulated derivatives markets or otherwise under the oversight of the CFTC could not be

more clear. Congress gave the CFTC "exclusive jurisdiction" to regulate derivatives trading on approved exchanges for on-exchange trading. 7 U.S.C. § 2(a)(1)(A). Without a unified approach to derivatives regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos." Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark). Congress punctuated the importance of preemption of state law by ensuring federal law supersedes and preempts state gaming law as applied to financial instruments the CFTC exempted from the registered exchange requirement. *See* 7 U.S.C. § 16(e)(2). Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026); *United States & CFTC v. Illinois*, No. 1:26-cv-03659, 2026 WL 2969682, at *6-11 (N.D. Ill. Oct. 2, 2026); *United States & CFTC v. Minnesota*, No. 26-cv-2661 (KMM/DTS), 2026 WL 2150211, at *13 (D. Minn. July 27, 2026); Order at 2-3, *KalshiEX, LLC v. Johnson*, No. 2:26-cv-01715 (D. Ariz. Apr. 10, 2026), ECF No. 65; *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

105. Defendants may therefore not attempt to enforce Missouri's gambling laws against OG.com—including, but not limited to, Mo. Const. art. III, §§ 39(g)1, 39(g)10.a, 39(g)6, 39(g)15 and 11 C.S.R. §§ 45-20.360(1)(A), 45-20.360(6), and any rules or regulations adopted thereunder—because OG.com is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

<u>**COUNT II**</u>

<u>**(Field Preemption – Against All Defendants)**</u>

106. Plaintiff incorporates all prior paragraphs by reference.

107. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

108. An actual controversy exists between OG.com, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of OG.com's event contracts.

109. By threatening to enforce the statutes at ¶ 105 or any other statutes, and any rules adopted thereunder, against OG.com, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

110. For the reasons described above, without regard to whether Defendants have correctly interpreted Missouri law, OG.com is authorized to list and offer event contracts to Missouri residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

111. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Missouri law, Missouri law is preempted pursuant to the Supremacy Clause.

112. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

113. Through the CEA and its amendments, Congress has adopted a comprehensive regulatory scheme regulating derivatives trading on regulated markets, including the trading of event contracts. *See* 7 U.S.C. §§ 1 *et seq*. That scheme includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading.

114. Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228.

115. Defendants therefore may not attempt to enforce Missouri's gaming laws against OG.com because OG.com is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

**COUNT III**

**(Conflict Preemption – Against All Defendants)**

116. Plaintiff incorporates all prior paragraphs by reference.

117. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

118. An actual controversy exists between OG.com, on the one hand, and the Defendants, on the other, regarding whether Defendants have legal authority to regulate the trading of OG.com's event contracts.

119. By threatening to enforce the statutes at ¶ 105 or any other statutes, and any rules adopted thereunder, against OG.com, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

120. For the reasons described above, without regard to whether Defendants have correctly interpreted Missouri law, OG.com is authorized to list and offer event contracts to Missouri residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

121. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Missouri law, Missouri law is preempted pursuant to the Supremacy Clause.

122. The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

123. Defendants likewise threatened to deploy Missouri law against OG.com in a manner that conflicts with federal law and policy. Defendants seek to ban event contracts that federal law and the CFTC have authorized or subject them to state regulatory requirements that conflict with federal law, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. For that reason among others, the threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 172 F.4th at 228.

124. Defendants therefore may not attempt to enforce Missouri's gaming laws against OG.com because OG.com is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq*.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff OG.com requests that judgment be entered in its favor and against Defendants as follows:

1. That this Court enter a judgment declaring that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to OG.com, violate the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2. That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to OG.com;

3. Award such other relief within this Court's discretion that it deems just and proper.

Dated: 16th day of October, 2026.


**BERKOWITZ OLIVER LLP**

By: *<u>/s/ John W. Shaw</u>*
John W. Shaw (MO #26205)
Lauren Tallent (MO #72304)
Stephanie Boord (MO #76819)
2600 Grand Boulevard, Suite 1200
Kansas City, MO 64108
Telephone: (816) 561-7007
Facsimile: (816) 561-1888
jshaw@berkowitzoliver.com
ltallent@berkowitzoliver.com
sboord@berkowitzoliver.com

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

David Meister (*pro hac vice* forthcoming)
Robert A. Fumerton (*pro hac vice* forthcoming)
Judith A. Flumenbaum (*pro hac vice* forthcoming)
One Manhattan West
New York, NY 10001
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
david.meister@skadden.com
robert.fumerton@skadden.com
judy.flumenbaum@skadden.com

Shay Dvoretzky (*pro hac vice* forthcoming)
Parker Rider-Longmaid (*pro hac vice* forthcoming)
Sylvia O. Tsakos (*pro hac vice* forthcoming)
1440 New York Avenue NW
Washington, DC 20005
Telephone: (202) 371-7000
Facsimile: (202) 393-5760
shay.dvoretzky@skadden.com
parker.rider-longmaid@skadden.com
sylvia.tsakos@skadden.com

*Attorneys for North American Derivatives Exchange, Inc., d/b/a OG.com Prediction Markets*